THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MICHAEL TUOHY MURPHY, Appellant.

Third Department, May 14, 1987

178

APPEARANCES OF COUNSEL

*O'Connell, Wolfe & Howley (J. Byron O'Connell* of counsel), for appellant.

*Andrew W. Ryan, Jr., District Attorney (Valerie Friedlander* of counsel), for respondent.

## OPINION OF THE COURT

CASEY, J.

The dead body of 10-year-old Andrew Pitkin was found in a wooded section of the Town of Peru, Clinton County, at about 10:00 P.M. on April 12, 1984. Andrew had sustained 33 stab wounds, at least two of which caused his death, estimated to have occurred sometime between 3:00 P.M. and 9:00 P.M. on the same day. Andrew, who lived two houses from defendant's home, had been a playmate of defendant's eight-year-old sister, Erin, and had been playing with her in the neighborhood earlier on the same day. At about 5:00 P.M. defendant asked Andrew if he wanted to help defendant exercise his family's dogs, and after receiving his mother's permission, defendant and Andrew left defendant's home, walking northwesterly toward Route 9 and Santa Lane.

At that point, which was about 6:10 P.M., according to defendant's later testimony, he heard a female voice, which he believed to be either Andrew's mother or sister, calling Andrew home. Defendant testified that he told Andrew that he "had better head home for dinner" and that Andrew replied "alright, good bye, see you later". The last time defendant admits having seen Andrew he was walking east toward Lake Champlain on Santa Lane in the direction of his home. Defendant stated that after Andrew left, he entered the woods

north of Santa Lane and began to run the dogs. As he was running he looked back to check on the dogs, tripped and fell into a hole, where he cut his left thumb on some broken bottles that were in the hole.

When defendant returned home at about 6:30 P.M., his father examined the cut and told defendant's older sister to put a Band-aid on it. According to defendant's father, blood was splattered on the front of defendant's shirt and on one of his cuffs, his right thigh was soaked with blood, and drips shaped like tear drops were on defendant's pants below the knees, with some spots on his sneakers. Defendant's step-mother testified that she later discovered smudges of blood on defendant's socks. She also stated that Andrew's mother had phoned her just after the boys left to exercise the dogs to inquire as to Andrew's whereabouts and when told, Andrew's mother requested that he be sent home upon his return. After this conversation, Erin requested that Andrew be permitted to stay for dinner. Having received permission, Erin called Andrew's mother back to tell her Andrew was having dinner at her house. When defendant returned without Andrew, he was asked why Andrew was not with him and replied that Andrew had been called home by his sister Amanda. At about 9:00 P.M. Andrew's father called to have Andrew sent home. He was informed by defendant's older brother, Patrick, that Andrew had not been there since before dinner and that defendant said he had been called home. Both Andrew's mother and his sister denied having called Andrew home at any time earlier. Andrew's body was found by Patrick, who went out searching for him after talking to Andrew's father on the phone. Patrick then ran back to tell the State Police who had been called to the neighborhood by Andrew's mother around 9:45 P.M.

The following day, the police discovered a knife containing the initials of defendant's father about 46 to 48 feet from the body, with what appeared to be blood on its blade and handle, and two fibers were embedded in this blood. In the area where the body was found, 99 feet of blood stains and droplets were found in an arc from the body. A hole of general circular shape, 7 feet in diameter and 2 feet 3 inches deep, described as an old cistern, was found lined with flat stones. This was identified by defendant, from photographs, as the hole into which he claims he fell and cut his hand. Defendant denied that there was water in the hole, but the police testified that it contained water measuring 1 foot 1 inch in depth.

After further police investigation, defendant was arrested and charged with murder in the second degree. Upon the District Attorney's refusal to consent to move the case to Family Court, defendant was tried as an adult pursuant to CPL 210.43. After trial by a jury, defendant was found guilty as charged and sentenced to an indeterminate term of nine years to life imprisonment.

On the day following the homicide, defendant's parents called Dr. Laura Millicovsky, a child psychiatrist, to come to their home and speak with them, and her husband, Guillermo Millicovsky, drove her there. While they talked, Mr. Millicovsky sat at the far end of the room. He heard defendant's parents state that their son returned after walking the dogs "covered with blood" or "soaked" or "drenched" with blood. At trial, the prosecution called Mr. Millicovsky on its direct case to contradict the testimony of defendant's parents, who had also been called by the prosecution on its direct case, but had minimized the amount of blood they said they observed on defendant's clothing. Appropriate objection by defendant was taken to the testimony of Mr. Millicovsky. It was, at the time it was offered, admitted by County Court as part of the prosecution's case-in-chief, as well as for impeachment purposes. However, when the court charged the jury, it limited the use of Mr. Millicovsky's testimony to impeachment purposes under CPL 60.35 (1).

As to defendant's clothing and his shoes, his parents testified that the clothing and shoes were placed in a plastic bag on a table in or near a cellar bedroom of their home, separate from the soiled laundry. The clothes were not found when the police searched the house pursuant to a search warrant and were never produced thereafter. County Court permitted the prosecution to introduce proof at trial that the clothes had disappeared when in the possession and control of defendant's parents to prevent the jury from drawing a negative inference from the prosecution's failure to produce the clothes and to show defendant's consciousness of guilt.

■ We do not agree with defendant's initial contention on this appeal that the evidence adduced is legally insufficient to support his conviction. It is axiomatic that in a case based on circumstantial evidence, such as this one, the burden is on the prosecution to prove beyond a reasonable doubt the commission of the crime by facts and circumstances which are all consistent with guilt. The inference which may be drawn from

the proven facts must exclude to a moral certainty every reasonable hypothesis except guilt *(People v Williams,* 35 NY2d 783). If this burden is met, however, a verdict is supportable even though the defense posits a version of the facts consistent with defendant's innocence. The guilty verdict thus rendered indicates that the jury accepted the prosecution's competing version of the facts *(People v Pena,* 50 NY2d 400, *cert denied* 449 US 1087). When so obtained, a guilty verdict requires the trial evidence to be viewed, on appeal, in a light most favorable to the prosecution *(People v Cleague,* 22 NY2d 363, 366).

Here, uncontradicted facts reveal that defendant and Andrew went into the woods together to exercise defendant's dogs shortly before 6:00 P.M. Only defendant returned at about 6:30 P.M. All the witnesses, including members of defendant's family, admit that defendant had blood on his clothing and shoes when he returned. His explanation that Andrew had left him at about 6:10 P.M. in answer to a call by Andrew's mother or sister was disputed by the latter two, who denied ever having called Andrew home and testified that he never came home. At about 10:00 P.M., Andrew was found by defendant's older brother in the woods. His death had been caused by stabbing and a knife, to which defendant had access, containing defendant's father's initials on its handle, was found 46 to 48 feet from the body. Human blood was found on the handle and blade of the knife, together with fibers which matched the fibers of Andrew's shirt. Contrary to defendant's contention that the knife blade, which was 3⅞ inches in length, was incapable of causing the deeper stab wounds, expert testimony offered by the prosecution indicated that a knife plunged into soft human tissue could inflict a wound deeper than the length of its blade. Viewed in a light most favorable to the prosecution, this evidence is sufficient to permit the jury to infer defendant's guilt of intentional homicide.

▇ Nor does defendant's explanation raise a reasonable doubt as to his guilt, as a matter of law. Defendant contends that the blood on his clothing came from the cut on his thumb which he received when he fell into a hole. He identified a general circular-shaped cistern near the body as the hole into which he fell. He stated that the hole contained no water, but the State Police said it contained approximately one foot of water and that it contained no broken glass. The jury could, thus, have reasonably rejected defendant's explanation.

■ In regard to his clothing, defendant contends that it was error to permit the prosecution to introduce the fact that the clothing had disappeared while in the exclusive possession of defendant and his family. We disagree. In our opinion, the prosecution correctly notes that the failure to produce the clothing or to account for its nonproduction would have allowed the jury to draw a negative inference against the prosecution as a result of this missing evidence (see, People v Geoghegan, 68 AD2d 279, 286, affd 51 NY2d 45; Fisch, New York Evidence § 1127, at 639 [2d ed]). It would be unfair to permit such an inference to be drawn against the prosecution in this case when the missing evidence was at all times in the exclusive control of defendant or members of his family and could not be found even when the family's premises were searched pursuant to a search warrant.

■ Despite our belief that this evidence was admissible for the purpose indicated, we consider the charge of County Court permitting the jury to draw an inference of defendant's consciousness of guilt from the failure to produce defendant's clothing to be erroneous. In essence, the court charged that consciousness of guilt could be inferred from the failure of defendant or his family to preserve and to produce defendant's bloody clothing. We do not believe that consciousness of guilt should be inferred by the jury against this 13-year-old defendant without at least some evidence of defendant's knowledge, authorization or participation in the loss or destruction of the clothing (see, People v Buzzi, 238 NY 390), and here there was no such showing.

We find further error in the introduction of the testimony of Mr. Millicovsky on the prosecution's direct case. This testimony was offered by the prosecution to contradict or to impeach the testimony of defendant's parents, whose prior testimony, when called by the prosecution, tended to minimize the amount of blood on defendant's clothing when he returned home. Significantly, the testimony of Mr. Millicovsky was not direct testimony of what he himself had observed (cf., Quick v American Can Co., 205 NY 330). Rather, the testimony was confined to what this witness had overheard defendant's parents state to his wife on the day after the murder. As such, the testimony was patently hearsay. The provisions of CPL 60.35 do not permit its introduction as an exception to the hearsay rule, for the statements of Mr. Millicovsky were neither contradictory statements signed by defendant's parents nor contradictory oral statements made by them under

oath *(see, People v Fuller,* 50 NY2d 628; *People v Jordan,* 59 AD2d 746, 747). Accordingly, such testimony was an impermissible attempt by the prosecution to impeach its own witnesses, defendant's parents, and its admission was erroneous.

We take a similar view of the testimony of Trooper Sheldon Pray. He was permitted to testify that defendant's older brother, Patrick, had told him that defendant had said that Andrew had been cut while the two were together earlier that day. In addition, Pray testified that Andrew's father had told him that Patrick had said that defendant told him he had fallen and cut himself on some glass earlier in the day. Properly objected to by defense as hearsay, this testimony should not have been admitted.

Despite these errors, reversal of defendant's conviction is not mandated since we consider the errors, singly or cumulatively, to be harmless under the test prescribed in *People v Crimmins* (36 NY2d 230, 240-242) for nonconstitutional error. Although circumstantial in nature, the evidence presented of defendant's guilt as outlined above overwhelmingly established his guilt beyond a reasonable doubt *(see, People v Morgan,* 66 NY2d 255, *cert denied* — US —, 106 S Ct 1984). To be more precise, we find that "the quantum and nature of proof, excising the error[s], are so logically compelling and therefore forceful in [this] * * * case as to lead [us] to the conclusion that 'a jury composed of honest, well-intentioned, and reasonable men and women' on consideration of such evidence would almost certainly have convicted the defendant" *(People v Crimmins, supra,* at 241-242). In considering the second prong of the *Crimmins* test, we find the errors harmless for they are not so prejudicial as to compel our conclusion "that there is a significant probability, rather than only a rational possibility * * * that the jury would have acquitted the defendant had it not been for the * * * errors which occurred" *(supra,* at 242).

The evidence on which County Court, in this case, based its charge of consciousness of guilt was properly before the jury to prevent their drawing a negative inference. Although we believe that this evidence, in the circumstances, does not support a charge of consciousness of guilt on the part of defendant and that such charge was error, we do not consider the error so prejudicial as to require reversal of defendant's conviction. We similarly view the errors in permitting the testimony of Mr. Millicovsky and Trooper Pray. The testimony of these witnesses was limited to the issue of credibility. As to

the prosecution's attempted attack on the testimony of defendant's parents in regard to the amount of blood on defendant's clothing, all of the other witnesses, including members of defendant's family, admitted to the existence of some blood. Only the amount was disputed. Upon recall, defendant's father denied the statements attributed to him by Mr. Millicovsky and, in its charge, County Court specifically limited Mr. Millicovsky's testimony to the issue of defendant's parents' credibility. The testimony of Pray, although hearsay, was likewise limited to the issue of credibility of other witnesses as to when, where and how defendant was cut. Limited as it was, the testimony was not so prejudicial as to constitute reversible error.

█ Defendant also seeks reversal since the stenographic record indicates that in charging the jury on the effect of circumstantial evidence, County Court used the word "include", rather than "exclude", when explaining that the evidence must exclude to a moral certainty every hypothesis except guilt, and the court further charged that the facts proved "must be not only inconsistent with guilt of the accused, but must also be inconsistent with his innocence". The prosecution contends that the apparent errors are the result of the stenographer's misapprehension of what County Court actually said, but we need not decide this issue. Prior to the court's charge, defendant submitted his requests to the court which, on the issue of circumstantial evidence, contained the correct wording of the erroneous phrases contained in the record. A comparison of the court's charge and defendant's request reveals that although the language differed, the basic rules of circumstantial evidence intended to be conveyed to the jury were the same. After reading the court's complete charge on circumstantial evidence, we are of the view that the inclusion of the incorrect words in the phrases referred to above, which was clearly erroneous, was inadvertent, rather than a refusal to charge the appropriate principles governing circumstantial evidence as requested. In these circumstances, where County Court gave a charge that was intended to convey to the jury the general principles requested by defendant but contained a few obviously incorrect words, defendant was required to alert the court of the error to afford an opportunity to correct it, and defendant's failure to do so results in a waiver of the objection (see, People v Whalen, 59 NY2d 273, 280; People v Hall, 124 AD2d 336). Accordingly, a question of law has not been preserved for our review, and we

do not find the error such that reversal is required in the interest of justice.

■ Next, the failure to preserve the stomach contents of Andrew more than 30 days after the police report of May 9, 1984 was not the destruction of *Brady* material, as defendant claims. County Court held a three-day hearing on this issue and defendant was unable to establish when Andrew had last eaten or what he had to eat. Lacking appropriate foundation, the destruction of the evidence cannot be considered the destruction of *Brady* material. That a spot of blood found on Andrew's shoe was type A, a type which matched the blood of his mother, and not the type of Andrew himself, which was type O, or of defendant, which was type B, is not so critical as to create a reasonable doubt of defendant's guilt, as a matter of law, and we accept its apparent rejection by the jury.

■ Further, contrary to defendant's claim, we do not find CPL 210.43 (1) (b) to be unconstitutional as vesting an unreviewable power in the District Attorney to decide whether a particular case should be tried in Family Court or in County Court. That statute does not create a right to have a particular case removed to Family Court *(Matter of Vega v Bell,* 47 NY2d 543, 551-553). The only right a defendant has in this regard is to be protected from arbitrariness *(People v Mason,* 99 Misc 2d 583) and none has been shown here. The other errors urged by defendant as to the impropriety of the prosecution's summation and County Court's ruling on rebuttal testimony have been considered and found untenable.

We find, in conclusion, that although defendant's trial was not free from error, no reversible error occurred and he was not deprived of a fair trial. The judgment of conviction should, therefore, be affirmed.

LEVINE, J. (dissenting). I respectfully disagree with the majority's conclusion that errors in the conduct of the trial were so harmless as not to require reversal and a retrial. Unquestionably, the prosecution's admissible evidence, if believed, was sufficient to satisfy the standard of proof for a circumstantial evidence case, notably, the proof that defendant was the last known person to have been alone with the victim in a secluded area before the murder, that a knife found in the area had on it human blood and fibers of the same material as the victim's shirt, was capable of inflicting the victim's stab wounds and had been accessible to defendant at his home, and that defendant falsely related hearing the

victim's sister or mother calling the victim home when he claimed that he and the victim parted company. From my reading of the record, however, I find that the remainder of admissible prosecution evidence, such as the minor discrepancies in the several versions of the places and chain of events defendant gave to various interrogators, that defendant was untruthful in maintaining that there was no quantity of water in the hole he fell into when he sustained the cut to his thumb, and that in the preceding year he once casually told another child that he "hated" the victim, were of little probative value and, given the tender age of defendant, not persuasively inconsistent with innocence.

In derogation of the strength of the evidence of guilt, there was an absence of any explanation for the spot of dried blood, characterized by a prosecution witness as being fresh, found on the victim's sneaker, which was of a type different from either that of defendant or of the victim, the absence of any inculpatory admissions by this 13 year old during the course of repeated questioning by the police and the lack of any credible evidence of motive for this brutal, senselessly violent homicide. The latter factors have commonly been relied upon in appellate review where evidence of guilt was found to have been overwhelming, in circumstantial or even direct evidence cases *(see, People v Morgan,* 66 NY2d 255, *cert denied* — US —, 106 S Ct 1984; *People v Fuller,* 50 NY2d 628; *People v Crimmins,* 36 NY2d 230). Additionally, the defense introduced expert testimony, which was not inherently improbable or conclusively refuted, that the time of what had to be almost instantaneous death from the stabbings was substantially after defendant returned home at about 6:30 P.M. and that the shape and depth of some of the wounds were inconsistent with their having been inflicted by the knife which, as previously discussed, the prosecution linked to defendant.

In short, I do not find that the evidence of guilt was either so exhaustive or so one-sided as to constitute overwhelming proof of guilt, the first of the two necessary factors that must be demonstrated before nonconstitutional error in a criminal case can be overlooked as harmless *(see, People v Crimmins, supra,* at 241-242). The jury was presented with some gaps and open questions in the proof and with sharply contested issues of credibility of both lay and expert witnesses, all of which had to be resolved before reaching a guilty verdict. In such circumstances, it cannot be fairly said that the quantum and nature of the proof, excising the error, was so logically com-

pelling and forceful as to lead an appellate court to conclude that a fairminded jury "would almost certainly have convicted the defendant" *(People v Crimmins, supra,* at 242).

Even assuming, arguendo, that the competent evidence adduced at trial constitutes overwhelming proof of guilt, I would nonetheless find a significant probability that the errors committed at the trial affected the verdict *(see, People v Crimmins, supra,* at 242). Determination of this issue obviously requires some qualitative evaluation of the importance of the role the improper conduct complained of or the inadmissible evidence played in the trial. In my view, the erroneous reception of evidence that defendant's clothes were "soaked" or "drenched" in blood through the witness Millicovsky's testimony of overhearing that description by defendant's stepmother, together with the equally erroneous jury instruction to the effect that the disappearance of the clothing while in defendant's parents' possession could be considered as consciousness of guilt, were critically damaging to the defense.

As previously pointed out, there was conflicting expert testimony on the time of death and as to the murder weapon. Hence, the forensic evidence was not conclusively against defendant. Whether the victim had been summoned home also presented a question of credibility between defendant and the victim's family. The presence of some quantity of blood on defendant's clothing was plausibly explained by the cut on his thumb, which did in fact exist. Defendant having been *covered* with blood on return from his walk with the victim, however, would be wholly unexplained by the cut on his thumb and totally inconsistent with any hypothesis other than defendant's involvement in the multiple stabbings of the victim. The damning nature of this evidence was emphasized in the prosecutor's summation, characterizing Millicovsky as a witness "who isn't under anybody's control * * * just a man who feels the truth has to be known. He has no relationship with anybody". The jury was encouraged to focus on the very same evidence in County Court's erroneous charge that it could consider the destruction or concealment of incriminating evidence as indicative of defendant's consciousness of guilt. Defendant's clothing, the only missing evidence in the case, would only have been incriminating, in the context of the entire proof, if it indeed had been drenched in blood. The combination of these errors was thus to improperly present to the jury evidence, from a purportedly totally disinterested

witness, which it could readily consider as the only unassailable proof of guilt.

I conclude, therefore, that the absence of overwhelming proof of guilt, and, alternatively, the significant probability of actual prejudice as a result of these trial errors, requires reversal and remittal for a new trial.

MAHONEY, P. J., KANE and WEISS, JJ., concur with CASEY, J.; LEVINE, J., dissents and votes to reverse in an opinion.

Judgment affirmed.